CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JAN 21 2022

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| FREDERICK T.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:20-cv-00070 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Frederick T. asks this Court to review the Commissioner of Social Security's

final decision denying his application for supplemental security income ("SSI") under Title XVI

of the Social Security Act, 42 U.S.C. § 1381–1383f. The case is before me by referral under 28

U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the

applicable law, I cannot find that the Commissioner's final decision is supported by substantial

evidence. Accordingly, I respectfully recommend that the decision be reversed and the case

remanded under the fourth sentence of 42 U.S.C. § 405(g).[2]

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] I decline Frederick's request for oral argument, Pl.'s Br. 28, ECF No. 17, because the facts and legal
positions are adequately presented in the materials before the court and a hearing would not aid the
decisional process. *See* Fed. R. Civ. P. 78(b); W.D. Va. Gen. R. 4(c)(2). The Commissioner did not
request oral argument.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *accord* 20 C.F.R. § 416.905(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

On June 26, 2017, Frederick applied for SSI alleging he was disabled by depression, anxiety, and schizophrenia. *See* Administrative Record ("R.") 119–20, 223–29. Frederick was fifty-two years old, or a "[p]erson closely approaching advanced age" under the regulations, when he filed for benefits. *See* R. 119; 20 C.F.R. § 416.963(d). Disability Determination Services ("DDS"), the state agency, denied his claim initially in September 2017, R. 119–31, and upon reconsideration the following February, R. 132–45. On November 15, 2019, Frederick appeared with counsel and testified at a hearing before ALJ Monica Flynn. *See* R. 59–101. A vocational expert ("VE") also testified. R. 92–99. Frederick turned fifty-five years old on November 20, 2019. R. 67, 223. He was a "[p]erson of advanced age" under the regulations, 20 C.F.R. § 416.963(e), for the rest of the relevant period.

ALJ Flynn issued an unfavorable decision on January 2, 2020. R. 23–32. She found that the relevant period for Frederick's SSI claim was June 26, 2017, the date he filed his application, through January 2, 2020, the date she issued her hearing decision. R. 23, 32; *see Gray v. Colvin*, No. 6:16cv9, 2017 WL 4296636, at *2 (W.D. Va. Aug. 8, 2017), *adopted by* 2018 WL 1547364 (W.D. Va. Mar. 29, 2018); 20 C.F.R. §§ 416.202, 416.300, 416.501. During that period,

Frederick had "severe" impairments of depression, anxiety, and schizophrenia. R. 25. Those

mental impairments did not meet or equal the relevant Listings because, although Frederick had

"marked limitations" in his overall ability to interact with others, he had lesser, "moderate"

limitations in his overall abilities to understand, remember, and apply information; "concentrate,

persist, or maintain pace"; and adapt or manage himself. R. 26 (citing 20 C.F.R. pt. 404, subpt. P,

app. 1 §§ 12.03, 12.04, 12.06).[4]

ALJ Flynn then evaluated Frederick's residual functional capacity ("RFC") during the

relevant time. *See* R. 27–32. She found that he did not have any physical limitations, but that his

mental impairments limited him to "performing simple, routine tasks; [making] simple[] work-

related decisions; interacting occasionally with coworkers and performing non-tandem work with

fewer than three coworkers; and never interacting with the general public." R. 27. ALJ Flynn

skipped step four because Frederick had no past relevant work. R. 31. Before step five, she found

that Frederick had at least a high-school education and was "born on November 20, 1964 and

was 52 years old, which is defined as an individual closely approaching advanced age, on the

---

[4] ALJs use a "special technique" to identify functional limitations caused by the claimant's medically determinable mental impairments and related symptoms. *See* 20 C.F.R. § 416.920a. At steps two and three, the ALJ must "rate the degree" to which claimant's mental "impairment(s) interferes with [his or her] ability to function independently, appropriately, effectively, and on a sustained basis" in "four broad functional areas . . . : Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.* § 416.920a(c)(2)–(3). The ALJ rates the claimant's overall degree of limitation using a five-point scale (none, mild, moderate, marked, and extreme), with the "last point on the scale represent[ing] a degree of limitation that is incompatible with [an] ability to do any gainful activity." *Id.* § 416.920a(c)(4); *see also* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2)(c)–(e) ("Moderate limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair[;] Marked limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited[;] Extreme limitation. You are not able to function in this area independently, appropriately, effectively, and on a sustained basis."). The ALJ's ratings also play an important role in a proper RFC determination, which is a more "holistic and fact-specific evaluation" of the claimant's ability to work for eight hours a day, five days a week despite his or her medical impairments. *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017); *see also Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015).

date [he] . . . filed" his SSI claim in June 2017. R. 31.[5] Finally, based on her RFC finding and the

VE's testimony about the job prospects for a similar "hypothetical individual . . . in their early

50s, with a high school education and no past work," R. 93, ALJ Flynn concluded that Frederick

was not disabled after June 26, 2017, because he still could perform certain "unskilled"

occupations (cleaner, laundry worker) that offered a significant number of jobs in the national

economy, R. 32 (citing R. 93–95). The Appeals Council declined to review that decision in

September 2020, R. 1–3, and this appeal followed.

### III. Discussion

Frederick argues that ALJ Flynn made two reversible legal errors when evaluating his

RFC. *See generally* Pl.'s Br. 15–23 (RFC does not reflect ALJ's findings that Frederick had

"moderate" to "marked" limitations in broad functional areas); *id.* at 24–28 (substantial evidence

does not support ALJ's evaluation of Frederick's alleged symptoms and functional limitations).

RFC is the claimant's "maximum remaining ability to do sustained work activities in an ordinary

work setting" for eight hours a day, five days a week despite his or her medical impairments and

related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The

Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC."

*Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a

function-by-function assessment based upon all of the relevant evidence of [the claimant's]

ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify

each impairment-related functional restriction that is supported by the record, *see Monroe v.*

*Colvin*, 826 F.3d 17, 179 (4th Cir. 2016). The RFC should reflect credibly established

---

[5] ALJ Flynn did not acknowledge that Frederick turned 55 years old—and therefore moved into the older
"person of advanced age" category—before she issued her decision in January 2020. *See* 20 C.F.R. §
416.963(b) ("We will use each of the age categories that applies to you during the period for which we
must determine if you are disabled.").

"restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related . . . activities" on a regular and continuing basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See, e.g.*, *Mascio*, 780 F.3d at 637–40 (limitations identified at step three). Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he or she weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. *See, e.g.*, 96-8p, 1996 WL 374184, at *7 ("If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted."). Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). *See Thomas*, 916 F.3d at 311–12. Conversely, a reviewing court that "cannot gauge the propriety of the ALJ's RFC assessment [generally] cannot say that substantial evidence supports the [Commissioner's] denial of benefits." *Patterson*, 846 F.3d at 662.

"Symptoms," or the claimant's own description of his or her medical impairment(s), 20 C.F.R. § 416.902(n), play a crucial role in a proper RFC determination, *Mascio*, 780 F.3d at 639–40. The regulations set out a mandatory two-step process for evaluating symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 416.929. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant," *Craig v. Chater*, 76 F.3d 585, 594, 596 (4th Cir. 1996) (ALJ's failure to "expressly consider" threshold question of whether

claimant "demonstrated by objective medical evidence an impairment [reasonably] capable of causing the degree and type of pain she alleges" was reversible legal error). Second, assuming the claimant clears step one, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio*, 780 F.3d at 637; *Hines*, 453 F.3d at 565. "The second [step] requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, after considering all relevant evidence in the record, 20 C.F.R. § 416.929(c). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). A reviewing court will uphold the ALJ's credibility finding if his or her articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)); *Hines*, 453 F.3d at 565–66.

A.    Summary

Frederick spent "most of his adult life" incarcerated. R. 529; *see* R. 261. Medical records from the Virginia Department of Corrections show some treatment for "anxiety attacks" or other "psych" disorder in 2008 and 2009. R. 424, 437. Frederick was released from prison in April 2015. R. 525 (Ex. 3F). That December, he told his counselor at Piedmont Community Services ("PCS") that he "experienced depression, anxiety[,] and paranoia in prison. He would ask to be put in solitary" confinement "when he felt his symptoms come" and, if that did not work, he would "refuse orders" so correctional officers would file disciplinary charges and put him in

solitary confinement. R. 526; *see also* R. 504 (Ex. 3F) ("Reports he would get anxious and

overwhelmed in prison and would manipulate things so he would be locked up in the 'hole.'");

R. 540 ("[H]e would intentionally request to be put in isolation so as not to have to deal with

people.") (Jan. 2016). Frederick acknowledged that the disciplinary charges "extended his time

in prison[,]" but explained that "he needed to isolate" because it was "the only way he could

cope." R. 526; *see also* R. 567–68 (Ex. 3F) (reporting the same in June 2017). After his release,

Frederick often told providers that he felt "sad and hopeless," he did "not enjoy things he used to

enjoy," he "overthinks" things and had "problems concentrating," he felt paranoid and "like

people know what is going on in his head," he paced and had to leave social situations, and that

it was "getting harder to be around people and he [was] isolating more." R. 508 (June 2015); *see*

*also* R. 481–80, 483–84, 490–91, 493–94, 497 (Ex. 2F) (reporting "little interest in doing

things," "anxiety/worry," "concentration issues," depression, "feeling on edge," "irritability,"

and/or "passive death wish") (Sept. 2015–Dec. 2016); R. 504 ("[H]e is working to establish a

routine b[ut] finds it difficult. . . . Reports he would like to do more things but does not feel

comfortable asking his family for help.") (May 2015); R. 524 ("[C]ontinued to struggle with

depression and anxiety.") (Nov. 2015); R. 535 ("States he is constantly watching and looking for

people he knows so he can avoid running into them.") (Dec. 2015); R. 539 ("Reports he is

paranoid and avoids people including family. Reports he is not sure what people are thinking

about him. States that if he does go out with his mother or father, he ends up sitting in the car.")

(Jan. 2016). Frederick's primary care provider, Tiffany Plunk, FNP, consistently noted that he

appeared "anxious," but had "fair" to "good" eye contact and was oriented without evidence of a

thought disorder. *See* R. 469, 473, 481, 491, 494, 497 (Ex. 2F).

     In January 2016, Don Tessmann, M.D., assessed "significant panic attacks [with]

agoraphobia along with some expressed depression," and prescribed Abilify, Celexa, and
Seroquel. R. 540 (Ex. 3F). Even with medication, Frederick told Dr. Tessmann and other PCS
providers that he "still [was] not coping well with being around people," R. 545, he "still ha[d]
good days and bad days," R. 547, and he often self-isolated, R. 551. In February, Frederick
"force[d] himself to attend a family birthday party" and was able to stay only "by isolating in a
corner." R. 551. That August, Dr. Tessmann opined that Frederick was "clinically stable at his
own level" and should keep taking Abilify, Celexa, and Seroquel as prescribed. *See* R. 561–62
(Ex. 3F). He consistently noted that Frederick exhibited "good, fair" judgment and insight, "no
obvious deficits" in recent or remote memory, and "generally goal directed" concentration and
attention span. *See* R. 540, 557, 561.

Frederick's medical records from the relevant period document continued medications
and outpatient counseling for schizoaffective disorder, depressive type, *see generally* R. 468–98
(Ex. 2F); R. 623–24 (Ex. 7F); R. 651–52 (Ex. 10F); R. 758–66 (Ex. 14F); agoraphobia with
panic disorder, *see, e.g.*, R. 540, 552, 557, 570, 596 (Ex. 3F); R. 626 (Ex. 6F); R. 640 (Ex. 9F);
major depressive disorder, severe without psychotic features, *see, e.g.*, R. 596 (Ex. 3F); R. 616
(Ex. 6F); R. 640 (Ex. 9F); and dysthymic disorder with anxious distress, *see* R. 784–88 (Ex.
15F). During a counseling intake exam in June 2017, Frederick appeared "guarded" and
exhibited "slowed" speech, depressed and anxious mood, flat affect, "little" insight, and "poor"
judgment. R. 572–73 (Ex. 3F). His memory and thought processes were normal. *Id.* Frederick
reported feeling anxious every day and having "depressed mood nearly every day" for the past
four months. R. 566–67. He described his anxiety "symptoms as heart racing, 'I got to move.'"
R. 567; *see also* R. 571 ("He presents with depressed mood nearly every day, marked diminished
interest or pleasure in activity, psychomotor retardation, recurrent thoughts of death, accelerated

heart rate, trembling, and shortness of breath."). That July, Frederick told his PCS counselor that he felt "stuck and want[ed] to move forward and be able to do things with other people," but he "panic[s] if he goes out in the community[,] which he describe[d] as a 'whole new fear.'" R. 576. He appeared "slightly anxious" and "spoke slowly" during this session. *Id.* In September, Frederick said that he still had anxiety every day, "depend[ing] on what he ha[d] to do." R. 594. For example, he got "anxious the night before about plans for the following day" if he knew he had to leave the house. *Id.* He also felt "anxious about going to his mother's house and back to his father's house and going out to the stores." *Id.* He again "describe[d] symptoms as heart racing, restless, trembling, and shortness of breath." *Id.* Frederick "greeted [the] counselor appropriately" during their session, but exhibited psychomotor retardation, slowed speech, depressed mood, and a flat affect. *Id.* His memory, thought processes, judgment, and insight were normal. *Id.*

Frederick's treatment records document similar symptoms and exam findings throughout the summer and fall of 2017. *See, e.g.*, R. 604 ("[G]reeted counselor appropriately. Presents with blunted affect. . . . Freddie finds it hard to communicate with people he does not know. Reports his anxiety increases and he cho[o]ses to avoid the situation and not interact with people in the community."); R. 606–07 ("[G]reeted counselor appropriately. Freddie presented with blunted affect and spoke softly and slowly. . . . States [that] when at his father's house he copes by making himself invisible and staying out of everyone's way."); R. 609 ("[R]eports poor attention and concentration," "being socially isolative and withdrawn," "excessive worry [about] 'what the next day is going to bring,'" "ruminative thoughts related to the past," and "'people are overwhelming'"); R. 611 (psychiatrist noting "poor eye contact," sad mood, and "mildly restrictive" affect, but cooperative attitude, normal speech, "adequate" attention/concentration,

and intact memory on exam); R. 612 ("Reports he copes by avoiding participation in activities or

he finds a place where he can sit out of the way and stays out of the way. . . . The anxiety comes

from anticipating that the events are going to be more than he can cope with."); R. 477–78, 621,

623, 626 (reporting social isolation, "anxiety/worry," "concentration issues," "depression-

stable," "feeling on edge," and "irritability"); R. 478, 623, 627 (NP Plunk noting that Frederick

was "anxious," but had "good eye contact" and no evidence of thought disorder on exams). In

July 2017, Frederick reported to DDS that he could weed, do laundry, and make simple meals

like sandwiches or ramen noodles, but he did not do these things "often." R. 262–63 (Ex. 4E);

*see also* R. 284 (Ex. 7E) ("I mostly fix a soup/ramen noodle."). He went grocery shopping "once

a month" for about fifteen minutes, R. 263, and visited close family members once or twice a

week, R. 264. *See also* R. 283. Other than that, he "mostly stay[ed] to [him]self." R. 265.

Frederick also "fear[ed] authority" figures, R. 285, but he did not allege specific problems

dealing with them, *see* R. 266, 286.

DDS psychologist Joseph Leizer, Ph.D., reviewed Frederick's record in September 2017.

*See* R. 123–30 (Ex. 1A). He opined that Frederick had three "severe" impairments—a

schizophrenia spectrum and other psychotic disorder; an anxiety and obsessive-compulsive

disorder; and a depressive, bipolar, and related disorder—that caused "marked" limitations in his

overall ability to interact with others and "moderate" limitations in his overall abilities to

understand, remember, or apply information; concentrate, persist, or maintain pace; and adapt or

manage himself. R. 123–24. More specifically, Frederick was "markedly limited" in his ability to

interact appropriately with the general public, and he was "moderately limited" in his abilities to

sustain an ordinary routine without special supervision; to work with or around others without

getting distracted; to complete a normal workday and workweek without interruptions from

11

psychologically based symptoms and to perform at a consistent pace without taking unreasonable

breaks; and to get along with coworkers or peers without distracting them or exhibiting behavior

extremes. R. 127. His specific abilities to maintain attention and concentration for extended

periods; to make simple work-related decisions; and to accept instructions and respond

appropriately to criticism from supervisors were "not significantly limited." R. 126–27. Dr.

Leizer further explained that Frederick could "perform simple, unskilled work," R. 126, but that

his "anxiety and agoraphobia . . . decrease [his] concentration and functioning" to the point that

he could work only "with less than 2 other people within a 10 ft. radius of himself" and tolerate

"up to 2 hours of interaction with the general public" and "less than 3 hours of interaction with

coworkers and peers per 8 hour workday," R. 127. DDS psychologist Louis Perrott, Ph.D.,

generally agreed with Dr. Leizer's medical opinion after reviewing Frederick's record in

February 2018. *See* R. 140–41 (Ex. 3A) (opining that Frederick could perform "simple 2–3 step

tasks," but that his "anxiety and agoraphobia cause a decrease in concentration and functioning;

[he] will be able to work with less than 2 other people within a 10 ft. radius of himself" and

should "be limited to up to 5 hours of interaction with the general public and coworkers within

an 8 hour workday").

       In early February 2018, Frederick rated his mood as "even keel" and noted that he

socialized with his parents. R. 638 (Ex. 9F). Trazadone was "partially effective" in managing his

anxiety, but he "continue[d] to ruminate about the past." *Id.* Findings on contemporaneous

mental-status exams were normal, R. 640, 645, including "good" judgment, insight, attention,

and concentration in late March 2018, R. 645. That May, Frederick presented to PCS "for

increased depression." R. 648. The examining provider noted Frederick exhibited "minimal eye

contact," "depressed" mood, and "flat/blunted/constricted" affect, but he cooperated and had

"adequate" attention/concentration. *Id.* Dr. Tessmann increased Frederick's Wellbutrin and continued Trazadone as prescribed. R. 649. Treatment records dated July 2018 through August 2019 document generally normal mental-status exams. *See* R. 651, 759, 762, 766 (Exs. 10F, 14F) (NP Plunk noting "good eye contact, oriented, anxious, no thought disorder . . . , talkative and interactive"); R. 783 (Ex. 15F) (depressed mood, but normal speech, affect, thought, memory, insight, and judgment). In September 2018 and May 2019, NP Plunk opined that Frederick's "medical co-morbidities" would require him to take "more than normal breaks during the workday" and "likely" cause him to "miss[] work to an extent that he would not be able to maintain consistent employment." R. 656, 657. In August 2019, Frederick told his counselor that he was "taking 'baby steps,'" but he still "experience[d] depression and anxiety around people, including family," and when "anticipating events with other people." R. 794 (Ex. 15F). "He always need[ed] a quiet, secluded area to retreat when engaged in social activities." R. 787 ("These symptoms have been present for greater than 2 years according to client's self-report and previous clinical assessments on record."). Frederick left his house two or three times a week, *id.*, usually to walk to the store or go to church, R. 794. Otherwise, he spent most of his time in his sister's basement watching TV and "try[ing] not to get in the way." R. 783; *see* R. 794 ("Reports he negotiates with himself and tries to find ways to stay out of the way.").

That November, Frederick testified that he recently started a part-time job stocking merchandise in a warehouse. *See* R. 70–71. The job was "stressful" because working around people "sends [him] into panic." R. 71. "[E]ven with the smiles, . . . [he] still [had] to constantly tell [him]self that they're not thinking whatever it is that's on [his] mind." *Id.* Taking Abilify, Trazodone, and Zoloft every day "still [didn't] help with the being calm and anxious." R. 72–73. Frederick explained that he took "a lot of breaks" during his eight-hour workday, R. 76–77,

because he was "constantly in [his] head" and "need[ed] to get away," R. 71. *See* R. 79 ("I'm basically trying to plan my escape the whole eight hours that I'm there."). His employer gave all employees a break at 5:00 and again at 7:30, but Frederick took "at least" another "six or seven" unannounced breaks throughout the day. R. 77 ("Q. And has anybody caught you doing that? A. No. I try to . . . sneak away, ma'am."). He would usually go to the restroom or "get lost in the building" for ten or fifteen minutes before going back to his workstation. *Id.* Frederick testified that he could not do this part-time job if he "could only [take] the breaks that the employer gives" all employees. *See id.* Working near "more than . . . four of five" people also made him nervous. *See* R. 78–79. Frederick "rarely" went to family gatherings. R. 79. He would go and say hello to a few people, but he was always "trying to get away and get back to the basement" where he could be alone. *Id.* Frederick took the same "get in, get out" approach when running errands. *See* R. 90 ("So, if I have to go in Wal-Mart[] or McDonald's . . . I'm trying to go in, and get what I got to get, and get out."). Watching a good TV show or YouTube video would "keep [his] interest for two and a half hours, or half an hour" as long as it gave his "mind something to think about other than all the rest of the stuff." R. 84; *see also* R. 614 ("He reports TV prevents him from ruminating.") (Dec. 2017). Frederick occasionally went to church, but only because it made his mother happy. R. 79; *see also* R. 612 ("Reports he goes to church with his mother on a regular basis which satisf[ies] her desire for him to go.") (Nov. 2017). He could drive, R. 282, but he did not drive because he did not have a valid license. *See* R. 83, 263, 527, 568, 791.

B.    *The ALJ's Decision*

ALJ Flynn summarized parts of Frederick's records beginning in "the summer of 2017," R. 28. *See generally* R. 26–31 (citing Exs. 1A, 3A, 4E, 7E, 2F, 3F, 6F, 7F, 9F, 10F, 14F, 15F, "Hearing Testimony"). At step two, she found that his depression, anxiety, and schizophrenia

14

"significant[ly] limited [his] abilities to perform basic [mental] work activities," R. 25, which according to the regulations include things like following "simple instructions," exercising judgment, "responding appropriately to supervision, co-workers[,] and usual work situations[,] and dealing with changes in a routine work setting," 20 C.F.R. § 416.922(b)(3)–(6). At step three, she found (as most relevant here) that those severe impairments "moderate[ly]" limited Frederick's overall ability to concentrate, persist, or maintain pace ("CPP"), and "marked[ly]" limited his ability to interact with others. R. 26. She identified "moderate" limitations with CPP because, although Frederick "contended that he has limitations in concentrating generally, following instructions, and completing tasks," he also said that he can "drive, prepare meals, and watch television," and the "record fails to show any mention of distractibility." *Id.* She identified "marked" limitations in his overall ability to interact with others because, while Frederick "alleged that he has difficulty dealing appropriately with authority," R. 26; *but see* R. 266, 285–86, he also admitted that he could "get along with others, shop, and spend time with his family" and "the medical evidence" showed that he "was described as pleasant and cooperative," R. 26.

ALJ Flynn found the DDS psychologists' medical opinions were "somewhat consistent with and supported by the record, which support[ed] marked limitations" in Frederick's overall ability to interact with others and "moderate limitations" in his abilities to understand, remember, or apply information; concentrate, persist, or maintain pace; and adapt or manage himself secondary to "symptoms including depression, anxiety, and irritability." R. 28 (citing Exs. 3F, 6F, 7F, 9F, 10F, 14F). More specifically, "the record" supported limiting Frederick to "performing simple routine tasks; [making] simple[] work-related decisions; occasionally interacting with coworkers and performing non-tandem work with fewer than three coworkers; and never interacting with the public." *Id.* (citing Exs. 3F, 6F, 7F, 9F, 10F, 14F, 15F); *accord* R.

27 (RFC finding). While Frederick "sometimes demonstrated depressed and anxious mood, had difficulty making eye contact, and spoke more slowly at appointments, he was generally noted to be alert, oriented, cooperative, and appropriately engaged at appointments with normal insight and judgment, normal memory, normal attention and concentration, [and] normal thought content and thought processes." R. 28–29 (citing Exs. 3F, 6F, 7F, 9F, 10F, 14F, 15F). "Overall," ALJ Flynn found the DDS medical opinions "persuasive," R. 29, and she incorporated into her RFC finding their limitations to "simple, unskilled work" and at most "occasional"[6] interaction with coworkers and the public, *see* R. 27. Her finding that Frederick could do "non-tandem work with *fewer than three* coworkers," R. 27 (emphasis added), is less restrictive than the DDS opinions limiting Frederick to working "with *fewer than two* other people within a ten foot radius of himself," R. 28 (emphasis added).

ALJ Flynn also rejected NP Plunk's opinion that Frederick would "require more frequent breaks than normal and need to miss work due to his impairments," R. 30 (citing R. 656–57), because it was "not consistent with or supported by the record," *id.* She noted again that "the record" supported a finding that Frederick could "work with limitations to performing simple routine tasks; [making] simple[] work-related decisions; occasionally interacting with coworkers and performing non-tandem work with fewer than three coworkers; and never interacting with the public due to depression, anxiety, and irritability." *Id.* (citing Exs. 3F, 6F, 7F, 9F, 10F, 14F, 15F); *accord* R. 27 (RFC finding). While Frederick "reported depression and anxiety symptoms including irritability, sadness, and self-isolating behaviors," he was "generally noted to be alert, oriented, cooperative, and appropriately engaged at appointments with normal insight and judgment, normal memory, normal attention and concentration, [and] normal thought content

---

[6] "'Occasional[ ]' means occurring from very little up to one-third of the time" and "should generally total no more than about 2 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

and thought processes," R. 30 (citing Exs. 3F, 6F, 7F, 9F, 10F, 14F, 15F). Thus, ALJ Flynn

found NP Plunk's opinions "unpersuasive" overall. *Id.*

Finally, ALJ Flynn noted Frederick's testimony that his allegedly disabling depression,

anxiety, and schizophrenia caused "difficulty remember[ing], completing tasks, concentrating,

understanding, following instructions, handling stress," and "being around people." R. 30. She

found that "[w]hile the record support[ed] the *types* of limitations [Frederick] ha[d] alleged, it

[did] not support their severity." R. 31. Frederick's psychiatric "impairments were managed with

conservative treatment," namely outpatient counseling and prescription medications, and

providers noted his depression was "stable" and "improve[d] with medication compliance." *Id.*

(citing Exs. 3F, 6F, 7F, 9F, 10F, 14F, 15F). Objective findings on mental-status exams showed

he was "generally . . . alert, oriented, cooperative, and appropriately engaged at appointments

with normal insight and judgment, normal memory, normal attention and concentration, normal

thought content, and appropriate grooming and self-care." *Id.* (citing Exs. 3F, 6F, 7F, 9F, 10F,

14F, 15F). Finally, Frederick "had been working for approximately a month at the time of the

hearing" in November 2019, and he "reported that he retained some capacity to . . . help with

some household chores, prepare simple meals, shop, live with and spend time with his family,

[and] watch television[.]" *Id.* Thus, ALJ Flynn concluded "[t]he record [did] not support the

severity of limitations alleged." *Id.*

C.    *Analysis*

Frederick contends that ALJ Flynn made two legal errors when evaluating his RFC. *See*

*generally* Pl.'s Br. 15–23. First, he argues there is an inherent inconsistency between her step-

three findings that he had "moderate" limitations maintaining CPP and "marked" limitations

interacting with others, R. 26, and her subsequent RFC finding that he nonetheless could perform

17

"simple, routine tasks" that involved "interacting occasionally with coworkers and performing

non-tandem work with fewer than three coworkers[, but] never interacting with the general

public," R. 27, because the ALJ "did not address [Frederick's] ability to sustain work activity"

throughout an eight-hour workday, Pl.'s Br. 17. *See* Pl.'s Br. 21–22 (discussing *Mascio*, 780 F.3d

at 637–40). He also notes that ALJ Flynn did not explain why she rejected the DDS opinions that

Frederick should be limited to working "with fewer than two other people within a ten foot

radius of himself," and instead found him capable of "non-tandem work with fewer than three

coworkers." *Id.* at 22 (citing R. 28–29, 127, 140). Second, Frederick argues that specific

treatment notes contradict ALJ Flynn's finding that his psychiatric disorders were "managed

with counseling and medication," *id.* at 24, and that ALJ Flynn mischaracterized the limited

extent of his daily activities to support her apparent conclusion that he could work eight hours a

day, five days a week, *see id.* at 25–28. I agree that ALJ Flynn committed two clear legal errors

in evaluating Frederick's RFC, both of which require reversal and remand.

*1. The* Mascio *Error*

In the Fourth Circuit, an ALJ who at step three finds at least a "moderate" limitation

maintaining concentration, persistence, or pace must either specifically account for that work-

related limitation in the RFC finding or explain why such a restriction is unnecessary. *Mascio*,

780 F.3d at 638; *cf. Patterson*, 846 F.3d at 659 (noting that the "RFC assessment is a holistic and

fact-specific evaluation" and "the ALJ cannot conduct it properly without reaching detailed

conclusions" at steps two and three about the "type and severity of the claimant's [mental]

impairments"). Merely restricting the claimant to "simple, routine tasks or unskilled work,"

without additional explanation, is not sufficient because "the ability to perform simple tasks

differs from the ability to stay on task. Only the latter limitation would account for a claimant's

[moderate] limitation in concentration, persistence, or pace." *Mascio*, 780 F.3d at 638 (internal

quotation marks omitted). Thus, the ALJ's decision must include a narrative discussion, citing

relevant evidence in the record, explaining either how the RFC accommodates the ALJ's finding

that the claimant's severe mental impairment(s) cause "moderate" (or more) overall limitations

sustaining CPP or why, notwithstanding that prior finding, this limitation "does not affect" the

claimant's ability to "stay on task" for a full workday and normal workweek. *Mascio*, 780 F.3d

at 638; *see, e.g.*, *Lonie B. v. Comm'r of Soc. Sec. Admin.*, No. DLB-19-1424, 2020 WL 2097683,

at *4 (D. Md. May 1, 2020) (remanding under *Mascio* where ALJ discussed relevant medical

evidence, but "offered no explanation as to why Plaintiff's issues with concentration and

persistence did not affect his ability to sustain work over an eight-hour workday"). Here, ALJ

Flynn appears to have concluded that Frederick's overall moderate limitations with CPP did not

affect his ability to perform simple, routine tasks for eight hours a day, five days a week.[7] R. 26,

27; *see also* R. 30 (rejecting NP Plunk's opinion that Frederick "would require more frequent

breaks than normal and need to miss days from work due to his impairments" because, although

Frederick "reported depression and anxiety symptoms including irritability, sadness, and self-

isolating behaviors, [he] was generally noted to be alert, oriented, cooperative, and appropriately

engaged at appointments with normal insight and judgment, normal memory, normal attention

---

[7] The Commissioner's position that ALJ Flynn necessarily "addressed" Frederick's "'ability to sustain work over an eight-hour workday'" because Frederick "would have been found disabled" had ALJ Flynn concluded that he was "unable to sustain work over an eight-hour workday," Def.'s Br. 14 (quoting Pl.'s Br. 20), ECF No. 21, is not persuasive. While any RFC "conclusion implicitly contain[s] a finding" that the claimant can "work an eight hour day," *Hines*, 453 F.3d at 563 (citing SSR 96-8p, 1996 WL 374184), the Commissioner's rules instruct that "the RFC assessment *must include a discussion* of the [claimant's] abilities *on that basis*," SSR 96-8p, 1996 WL 374184, at *2 (emphasis added). An implicit finding is not sufficient where, as here, the ALJ rejects the claimant's allegations that medical impairments and related symptoms prevent him or her from working eight hours a day, five days a week. *See id.* at *2–3; *Mascio*, 780 F.3d at 637 ("[A]lthough the ALJ concluded that Mascio can perform certain functions, he said nothing about Mascio's ability to perform them for a full workday."); *Hines*, 453 F.3d at 565 (reversing and remanding where ALJ improperly rejected claimant's allegations "that his pain is so continuous and/or so severe that it prevents him from working a full eight hour day").

19

and concentration, normal thought content and processes, and appropriate grooming and self-care." (citing Exs. 3F, 6F, 7F, 9F, 10F, 14F, 15F)). Because she did not adequately explain how she reached that conclusion, however, I cannot determine whether her RFC finding is supported by substantial evidence.[8] For example, ALJ Flynn did not explain how Frederick's persistent problems with social avoidance and ruminative or paranoid thinking, *see, e.g.*, R. 70–79, 84, 90, 504, 508, 526, 535, 539, 540, 551, 567–68, 576, 594, 604, 606–07, 609, 612, 614, 638, 783, 794, impacted his ability to stay on task during a normal workday.

Frederick also argues that the RFC finding's social restrictions—namely that he only occasionally interacts with coworkers, performs "non-tandem work with fewer than three coworkers," and never interacts with the public—do not reflect ALJ Flynn's earlier finding that Frederick has "marked" limitations in social interaction. *See* Pl.'s Br. 21–22 (citing *Panna v. Colvin*, No. 2015 WL 5714403, at *3–4 (W.D.N.C. Aug. 31, 2015) (recommending reversal and remand under *Mascio* where ALJ found at step three that claimant had overall "moderate" limitations in social functioning, but subsequent RFC finding did not include any restrictions on social interaction), *adopted*, 2015 WL 5725246 (W.D.N.C. Sept. 29, 2015))). Frederick does not further develop this argument, or explain why restricting him to about two hours' interaction with coworkers and no interaction with the public during an eight-hour workday, *see* SSR 83-10, 1983 WL 31251, at *5, fails to accommodate ALJ Flynn's finding that his mental impairments "seriously limited" his social functioning, 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2)(d). *See, e.g.*, *Kane v. Saul*, No. 3:18cv746, 2019 WL 7562760, at *11–13 (E.D. Va. Aug. 20, 2019)

---

[8] To the extent ALJ Flynn's apparent conclusion relies on her earlier finding that "the record fails to show *any* mention of distractibility," R. 26 (emphasis added), that finding contradicts the DDS psychologists' opinions that Frederick had "moderate" limitations working near others "without being distracted by them" and that his "anxiety and agoraphobia cause[d] a decrease in concentration and functioning" such that he could work only "with less than 2 other people within a 10 ft radius of himself," R. 127, 140. ALJ Flynn did not explain why she apparently rejected these aspects of the DDS opinions despite finding them "persuasive" overall. *See* R. 28.

(RFC limiting claimant to occasional interaction with coworkers and supervisors, and no interaction with public, accommodated ALJ's finding of "marked" limitations interacting with others), *adopted by* 2020 WL 130134, at *4–5 (E.D. Va. Jan. 10, 2020) (vacating and remanding Commissioner's final decision on other grounds).

Nonetheless, I agree ALJ Flynn failed to explain how she found that Frederick could do "non-tandem work with *fewer than three* coworkers," R. 27 (emphasis added), and why, despite finding the DDS psychologists' opinions to be "persuasive" overall, R. 29, she rejected their conclusions that Frederick could work only "with *less than 2 other people* within at 10 ft radius of himself." *See* Pl.'s Br. 22 (citing R. 27–29, 127, 140) (emphasis added). *Cf. Woods*, 888 F.3d at 694 (reversing and remanding where "ALJ concluded that Woods could perform 'medium [exertion] work' and summarized evidence that he found credible, useful, and consistent," but "never explained how he concluded—*based on this evidence*—that Woods could actually perform the tasks required by" such work); *Warren v. Astrue*, No. 2:08cv3, 2008 WL 325756, at *11 (W.D. Va. Aug. 8, 2008) ("The ALJ's decision cannot be supported by substantial evidence when he fails to adequately explain his rationale for rejecting the opinions of those whom he otherwise gave great weight to in arriving at his decision."). While the Commissioner's regulations no longer require ALJs to "give any specific evidentiary weight" to medical opinions, 20 C.F.R. § 416.920c(a), the substantial evidence standard does require an ALJ to provide some reasoned basis for "rejecting probative evidence" supporting a disability finding, *Hood v. Astrue*, No. SKG-08-2240, 2009 WL 4944838, at *7 (D. Md. Dec. 14, 2009). *See Wireman v. Barnhart*, No. 2:05cv45, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006); *Schoofield v. Barnhart*, 220 F. Supp. 2d 512, 519 (D. Md. 2002) ("This court has long required specific reference to the evidence supporting an ALJ's decision as part of the ALJ's 'duty of explanation.' Conversely,

21

when faced with evidence in the record contradicting his conclusion, an ALJ must affirmatively

reject that contradictory evidence and explain his rationale for so doing." (quoting *Hammond v.*

*Heckler*, 765 F.2d 424, 426 (4th Cir. 1985) (other citations omitted)). Otherwise, the court cannot

"determine whether the ALJ's decision" to deny benefits "is supported as a matter of fact and

law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). *See King v. Califano*, 615 F.2d

1018, 1020 (4th Cir. 1980) ("The [ALJ] must . . . explain on the record the reasons for his

findings, including the reason for rejecting relevant evidence in support of the claim. Even if

legitimate reasons exist for rejecting or discounting certain evidence, the [ALJ] cannot do so for

no reason or for the wrong reason." (internal citation omitted)). ALJ Flynn's conclusory

statement that "the record" supports limiting Frederick to "non-tandem work with fewer than

three coworkers," followed by blanket citations to medical exhibits that contained a mix of

normal and abnormal findings on mental-status exams, R. 28–29 (citing Exs. 3F, 6F, 7F, 9F,

10F, 14F, 15F), sheds no light on why she rejected the DDS psychologists' limitation and instead

found that Frederick could work with up to three coworkers, R. 28. Her decision therefore "failed

to build an accurate and logical bridge from the evidence [s]he recounted to [her] conclusions

about [Frederick's] residual functional capacity." *Woods*, 888 F.3d at 694.

    *2. Frederick's Symptoms*

    ALJ Flynn also committed reversible legal error when evaluating Frederick's symptoms.

As noted, the regulations set out a mandatory two-step process for evaluating symptoms. *Lewis*,

858 F.3d at 865–66; 20 C.F.R. § 416.929. "First, the ALJ looks for objective medical evidence

showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at

866, "in the amount and degree[] alleged by the claimant," *Craig*, 76 F.3d at 596. Second,

assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and

limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio*, 780 F.3d at 637. *See Craig*, 76 F.3d at 595 ("It is only *after* a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain [or other symptom] claimed, that the intensity and persistence of the claimant's [symptom], and the extent to which it affects her ability to work, must be evaluated."). "The second [step] requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, and give specific reasons, supported by "references to the evidence," for the weight assigned to those statements, *Edwards*, 2013 WL 5720337, at *6.

Here, ALJ Flynn found that "the record support[ed] the *types* of limitations" Frederick alleged, but that "it [did] not support their severity," R. 31, because he generally had normal findings on mental-status exams, his psychiatric disorders "were managed with conservative treatment including counseling and medication," he "reported that he retained some capacity to manage his personal care, help with some household chores, make simple meals, shop, live with and spend time with his family, watch television, and attend medical appointments," and he had worked for about a month as of November 2019. *See id.* (citing Exs. 3F, 6F, 7F, 9F, 10F, 14F, 15F). Frederick takes issue with ALJ Flynn's finding that his anxiety and depression were "managed" with treatment, Pl.'s Br. 24 (citing treatment notes showing Frederick presented with "anxious mood," "fair insight and judgment," and "depressed mood and slowed speech" despite taking medications), as well as her reliance on the types of daily activities Frederick performed without "qualify[ing] the extent to which [he] performed" them, *id.* at 26 (citing *Woods*, 888 F.3d at 694 ("An ALJ may not consider the *type* of activities a claimant can perform without also

considering the *extent* to which she can perform them.")). I agree that ALJ Flynn did not fairly

consider Frederick's statements describing his extremely limited and infrequent daily activities,

*see, e.g.*, R. 79, 84, 90, 262–65, 283–85, 539, 551, 576, 594, 604, 606–07, 612, 783, 787, 794,

and that her decision "provided no explanation as to how" Frederick's actual activities showed

that he "could persist through an eight-hour workday" for five days a week, *Brown*, 873 F.3d at

263. *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 101 (4th Cir. 2020) ("If Arakas's

qualifying statements are properly considered, it becomes clear that she could perform only

minimal daily activities that in no way suggested any ability to engage in full-time work on a

sustained basis."); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical

differences between activities of daily living and activities in a full-time job are that a person has

more flexibility in scheduling the former than the latter, can get help from other persons . . . , and

is not held to a minimum standard of performance, as she would be by an employer.").

The bigger problem, however, is that ALJ Flynn did not "expressly consider the threshold

question of whether [Frederick] had demonstrated by objective medical evidence," *Craig*, 76

F.3d at 596, the existence of a mental impairment(s) that "could *reasonably be expected* to

produce the actual [symptoms], in the amount and degree," that Frederick alleged, *id.* at 594

(emphasis added). *See* R. 31 ("While the record supports the *types* of limitations that the

claimant has alleged, it does not support their severity."); *Danielle B. v. Saul*, No. 4:20cv27,

2021 WL 2845317, at *8–9 (W.D. Va. July 8, 2021) (ALJ's use of identical language did not

constitute express Step One finding required by regulations). "Instead, the ALJ proceeded

directly to considering the credibility of those allegations," *id.* a 594, stating various reasons why

"the record [did] not support the severity of limitations alleged," R. 31. *See Danielle B.*, 2021

WL 2845317, at *8–9. This is reversible legal error, *see Craig*, 76 F.3d at 595, that requires

24

remand "so that the Commissioner can conduct [the] proper two-step analysis of [Frederick's] alleged symptoms and limitations," *Danielle B.*, 2021 WL 2845317, at \*9 (collecting cases holding the same).

## IV. Conclusion

I take no position on whether Frederick is entitled to disability benefits. On remand, the ALJ must consider and apply the applicable legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming Frederick cannot prove disability at step three, provide an accurate, logical link between the evidence the ALJ found credible and the RFC determination. Additionally, to carry her burden of proof at step five, the Commissioner must elicit reliable evidence "about the availability of jobs to a hypothetical person" like Frederick, *Dozier v. Colvin*, No. 4:14cv93, 2015 WL 3791349, at \*5 (E.D.N.C. June 17, 2015), in each age category that applies to him during the period for which the ALJ must determine if Frederick is disabled, 20 C.F.R. § 416.963(b). *Dozier*, 2015 WL 3791349, at \*5–6 (reversing denial of benefits where ALJ relied on VE testimony placing claimant in the "younger person" category and did not ask VE about job prospects for a person "in the closely-approaching-advanced-age category").

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Frederick's Motion for Summary Judgment, ECF No. 16, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 20, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: January 21, 2022

Joel C. Hoppe
United States Magistrate Judge

26